UNITED STATES DISTRICT COURT

FOR THE EASTERN DISTRICT OF CALIFORNIA

| | |
|---|---|
| United States of America, | No. 2:20-cr-00034-KJM |
| Plaintiff, | ORDER |
| v. | |
| Derick Louangamath, | |
| Defendant. | |

Defendant Derick Louangamath moves to suppress all the evidence found in his car, on his cellphone, and all statements made in the course of a November 2019 traffic stop. Mot., ECF No. 36. The United States agreed to exclude defendant's answers to some of the officer's questions but opposed the rest of the motion. *See* Opp'n at 1, ECF No. 43. As defendant requested, the court held a two-day evidentiary hearing. Mia Crager and Hannah Labaree represented the defendant and Aaron Pennekamp represented the United States. The government presented two witnesses, Officer Cunningham and Officer Phelan of the City of Sacramento Police Department, who conducted the traffic stop. The defense presented testimony by Paul Schindler, a private investigator who had a thirty-year career as a police officer, and the defendant also testified. At hearing, the court allowed the parties to provide written closing arguments, Gov't Closing Br., ECF No. 88; Def. Closing Br., ECF No. 89, and after receiving them

/////

1

1  submitted the matter.  After carefully considering the evidence and the parties' arguments, the

2  court **denies** the motion to suppress for the reasons explained below.

3  **I.     BACKGROUND**

4       Six nights before the traffic stop in this case, police responded to a multiple-victim

5  shooting by Mongolian Boys Society gang members in Fresno, California.  Aff. in Support of

6  Compl. ¶ 61, Def. Ex. U. (lodged).  Three days after the shooting, the Sacramento Police

7  Department issued a "gang intelligence bulletin," which "strongly encouraged" any "officers

8  coming in contact with any suspected gang-members" of the Asian Crips or Mongolian Boys

9  Society "to take appropriate enforcement actions."  Gang Intelligence Bulletin, Ex. EE Def. Ex.

10 List (lodged).  This bulletin was one of up to twenty covering a range of topics including

11 information about specific crimes or defendants emailed to officers during the week.  Tr. at

12 37:11–38:4, 163:19, ECF Nos. 77 & 83.  Both officers who conducted the traffic stop and search

13 received the bulletin, though neither remembered reading it.  *Id.* at 38:8–11, 181:5–19.

14      On November 23, 2019, Officers Cunningham and Phelan saw Mr. Louangamath driving

15 in the parking lot of a commercial strip center at 1500 West El Camino.  Tr. at 17:11–18;

16 Cunningham Decl. ¶ 1, ECF No. 43-2.  The officers were driving southbound, Officer Phelan in

17 the driver's seat and Officer Cunningham in the passenger's seat; Mr. Louangamath was headed

18 northbound.  Tr. 17:17–23.  The cars passed one another slowly.  Mr. Louangamath recalled that

19 the officers stared at him for about ten seconds.  Tr. 286:5–13.  The officers thus had time to look

20 at the car as it approached, peer into it, and, potentially, see something written on the driver's side

21 back window: "Fucc You."  Tr. at 18:7–10; Orientation of Vehicles, Def. Ex. P-Marked (lodged),

22 ECF No. 85; Cunningham Decl. ¶ 3; Still Image, Def. Ex. F (lodged).  Both officers knew Crip

23 gang members substitute other letters for "CK" because "CK" can mean "Crip Killer."  Tr. at

24 69:16–18, 185:21–186:24 ("The 'C' and then the 'K' would be Crip Killer, so it's all very, like,

25 basic, or one might say petty that you would spell a word differently to not put a 'C' and 'K' next

26 to each other if you are a Crip.").  Neither officer recalled seeing the writing in the parking lot as

27 they drove past Mr. Louangamath, *id.* at 86:23–25, 195:2–4, though Officer Phelan did recall

28 /////

1   seeing it during the traffic stop as evidenced by his testimony and body camera footage, *id.* at

2   77:12–78:8; Gov. Ex. 1A (hard copy provided at evidentiary hearing, admitted and retained).

3          In any event, potential gang affiliations did not form the basis of what the officers did

4   next.  Officer Cunningham testified he could tell Mr. Louangamath's high-beam headlights had

5   been on, and he mentioned it to Officer Phelan, who agreed "his headlights appeared to be bright

6   —brighter than normal."  Tr. at 18:7–10.  Officer Cunningham is confident

7   Mr. Louangamath's high beams were on in the parking lot, as it is a "pet peeve" of his when

8   people leave them on.  *Id.* at 124:22–25.  He testified this is so in particular because, at the time,

9   he was living in the country and was often irritated when other drivers used their high beams on

10  the dark country roads.  *See id.* at 211:2–7.  The officers did not signal to Mr. Louangamath in

11  the parking lot that his high beams were on; instead they decided to follow him out of the

12  parking lot.  *Id.* at 211:24–212:3.

13         The officers made a three-point turn in the parking lot, briefly lost sight of

14  Mr. Louangamath, and then spotted him pulled over to the side of the road approximately one

15  block from the parking lot, on Sea Mist Road.  Tr. at 24:15–27:23, 128:18–129:19.  Upon seeing

16  the stopped vehicle, the officers first ran the defendant's license plates, *id.* at 209:18–25, and

17  then Officer Cunningham called in to report the car as a "suspicious vehicle," *id.* 27:9–13.

18  Computer Aided Dispatch Report at 1, ECF No. 36-1.  According to Officer Cunningham, this

19  term did not have any special meaning: Sacramento Police Officers may report cars as suspicious

20  vehicles when they do not have more information or when people pull themselves over.  Tr. at

21  205:12–206:19.  According to the defense expert, investigator Schindler, vehicles are called in as

22  "suspicious vehicles" when officers are concerned something suspicious is occurring in the car

23  and they want to alert other officers "for safety reasons*." Id.* at 255:21–25.  Under cross

24  examination, Mr. Schindler clarified he had not been a part of any internal Sacramento Police

25  Department trainings since 2012 and his experience regularly conducting traffic stops was 25

26  years old.  *Id.* at 268:20–23, 270:6–8.  As it is undisputed the officers did not turn on their body

27  cameras while they were driving in the parking lot, there is no video evidence capturing the

28  /////

1   officers' field of vision from their car at the time; nor is their audio of the police officers

2   discussing why they thought Mr. Louangamath's vehicle appeared suspicious.

3        Once the officers pulled up behind Mr. Louangamath's car, they did activate their body

4   cameras.  Officer Phelan turned on his body camera from the hard-off position while Officer

5   Cunningham's body camera turned on when the police car's overhead lights were activated.  *Id.*

6   at 29:4–7, 101:22–25, 133:21–24.  When the officers approached Mr. Louangamath's car, Officer

7   Phelan asked about the high beams.  Officer Cunningham Body Camera Footage 3:58, Def. Ex. B

8   (lodged) ("Are your, uh, high beams on?" "No?" "Did you have 'em on when you passed me

9   back there?" "'Cause they seemed like they were on.").  After hearing a number of questions

10  from Officer Phelan, Mr. Louangamath apologized: "Oh, my bad."  *Id.*  But in sworn declarations

11  submitted in connection with the evidentiary hearing, both Mr. Louangamath and his girlfriend,

12  who was a passenger in the car, averred the high beams were never on.  *See* Kalah Decl. ¶ 8;

13  Louangamath Decl. ¶ 3.  At the evidentiary hearing, Mr. Louangamath explained he was

14  confident his high beams were not on previously because no one in the busy parking lot had let

15  him know they were on, and the dashboard indicator for high beams was off at the time.  Tr. at

16  288:5–6, 301:15.  Officer Phelan testified that the high beams were on even at the time of the

17  traffic stop, as the "headlights reflecting off the car in front of him where he had parked . . .

18  appeared to be very bright."  *Id. at* 28:8–14.  There is body camera footage showing

19  Mr. Louangamath's headlights reflected in the bumper of a car parked in front of where he

20  stopped; the footage standing alone is inconclusive.  *See* Body Camera Footage 3:58 (headlights

21  of car reflected in bumper of car ahead and appear not overwhelmingly bright).  Officer

22  Cunningham testified that Mr. Louangamath turned off his high beams after Officer Phelan

23  "made him aware that they were on."  *Id.* at 166:1–7.

24       After asking about the high beams, Officer Phelan asked Mr. Louangamath and his

25  girlfriend for identification.  *Id.* at 3:58–59.  Mr. Louangamath did not have a driver's license on

26  him, and he admitted his driver's license was not valid in response to Officer Phelan's question.

27  Body Camera Footage 3:58–3:59.  After learning that Mr. Louangamath was on parole, the

28  officers asked for and received his consent to search his car.  *Id.* at 3:59.  During the search, they

1  found open beer cans as well as the firearm and ammunition underlying the pending charge in this

2  case.  Tr. at 34:13–20.  Officer Cunningham made two phone calls soon after the stop to South

3  Sacramento police officers to arrange a parole search and referenced a "car stop . . . with an Asian

4  gangster."  *Id.* at 234:4–19; Def. Exs. Bw & Bx (lodged).

5        Mr. Louangamath argues the officers' testimony about the high beams is not credible and

6  they never actually believed his high beams were on; rather they invented this explanation after

7  the fact to justify their decision to follow and search the car he was driving.  Def. Closing Brief at

8  3.  He moves to exclude all physical evidence from the traffic stop under the Fourth Amendment,

9  including the firearm, ammunition, and cellphone.  *See* Mot. at 13; Reply at 10–12, ECF No. 46.

10  The government argues the high beams were on in the parking lot and traffic stop, the officers

11  reasonably suspected a traffic violation, and the stop and search were reasonable.  Gov. Closing

12  Brief at 20.

13  **II.    LEGAL STANDARD**

14        When a defendant moves to suppress evidence under the Fourth Amendment's

15  exclusionary rule, the first step is deciding whether a Fourth Amendment violation occurred.

16  *Davis v. United States*, 564 U.S. 229, 236–37 (2011).  Traffic stops may implicate the Fourth

17  Amendment "because stopping an automobile and detaining its occupants constitute[s] a

18  seizure . . . even though the purpose of the stop is limited and the resulting detention quite brief."

19  *United States v. Choudhry*, 461 F.3d 1097, 1100–01 (9th Cir. 2006) (quoting *Delaware v. Prouse*,

20  440 U.S. 648 (1979)) (quotation marks omitted).  "The government bears the burden of

21  establishing that a warrantless search was reasonable and did not violate the Fourth Amendment."

22  *United States v. Jones*, 438 F. Supp. 3d 1039, 1049 (N.D. Cal. 2020), *appeal dismissed sub nom.*

23  *United States v. Walker*, No. 20-10099, 2020 WL 3067525 (9th Cir. Mar. 18, 2020) (citing *United*

24  *States v. Carbajal*, 956 F.2d 924, 930 (9th Cir. 1992)).

25        Police officers may conduct a traffic stop when they have reasonable suspicion of a traffic

26  violation.  *Choudhry*, 461 F.3d at 1102 (citing *Whren v. United States,* 517 U.S. 806, 810 (1996));

27  *United States v. Lopez-Soto*, 205 F.3d 1101, 1105 (9th Cir. 2000).  Officers must identify

28  "specific, articulable facts" as the basis for their reasonable suspicion, which courts must assess in

1    the context of "objective and reasonable inferences." *Id.* at 1100.  If officers had no reasonable

2    suspicion, the seizure was unlawful, and any of its fruits may be excluded.  *See id.* at 1106.

3          "To determine whether an officer had a reasonable suspicion that a traffic violation had

4    occurred, courts must examine the 'totality of the circumstances' of each case to see whether the

5    detaining officer had a 'particularized and objective basis' for suspecting wrongdoing." *United*

6    *States v. Kash*, No. 13-00330, 2015 WL 7188219, at *3 (E.D. Cal. Nov. 16, 2015), *aff'd*,

7    751 F. App'x 1007 (9th Cir. 2018).  The court may not probe officers' "[s]ubjective intentions."

8    *Whren*, 517 U.S. at 813.  "An officer is entitled to rely on his training and experience in drawing

9    inferences from the facts he observes, but those inferences must also 'be grounded in objective

10   facts and be capable of rational explanation.'" *Lopez-Soto*, 205 F.3d at 1105 (quoting *United*

11   *States v. Michael R.*, 90 F.3d 340, 346 (9th Cir. 1996)).

## III.   ANALYSIS

13         Here, even if the body camera video and officers' testimony does not conclusively show

14   Mr. Louangamath's high-beams were on at the time of traffic stop, the stop may yet have been

15   reasonable if the officers reasonably suspected a previous traffic violation.  *See United States v.*

16   *Willis*, 431 F.3d 709, 715–16 (9th Cir. 2005) (officers delay in pulling defendant over after

17   committing an illegal U-turn was "insignificant" because officers testified they watched

18   defendant make an illegal u-turn).  The officers have pointed to specific articulable facts to

19   ground their reasonable suspicion.

20         First, California Vehicle Code provides in pertinent part that "[w]henever the driver of a

21   vehicle approaches an oncoming vehicle within 500 feet, he shall use a distribution of light or

22   composite beam so aimed that the glaring rays are not projected into the eyes of the oncoming

23   driver."  Cal. Veh. Code § 24409(a).  There is no exception in the Vehicle Code for high beam

24   use in parking lots.  Both officers were aware of the statutory provision, Tr. 1 18:23–19:15,

25   125:21–126:14, both testified Mr. Louangamath's high beams were on in the parking lot, and

26   both had memorialized the same in their reports following the incident.  Phelan Decl. ¶ 4, ECF

27   No. 43-3.  Officer Cunningham's confidence was grounded in his personal irritation with drivers'

28   /////

6

1  keeping high beams on even when approaching another vehicle.  Tr. at 211:5–13.  The court finds

2  no reason not to believe the officers' testimony in this respect.

3      Second, even if there were evidence of the officers' other potential motivations it would

4  not undercut their testimony about Mr. Louangamath's high beams being on.  Under *Whren*, even

5  pretextual traffic stops do not violate the Fourth Amendment when officers have probable cause

6  to believe the person has violated traffic laws.  *See United States v. Hudson*, 100 F.3d 1409, 1416

7  (9th Cir. 1996) ("[W]e may not inquire into whether the officer's behavior had improper motives

8  or deviated from the typical practice of reasonable officers."); *Bond v. United States*, 529 U.S.

9  334, 338 n.2 (2000) (calling "subjective" motivations "irrelevant" to the Fourth Amendment

10  analysis).  Neither officer recalled the gang intelligence bulletin referencing Asian gangs

11  specifically, including whether it informed their actions at the time of the stop.  Tr. 116:14–25,

12  164:1–9.  Both said they were unable to identify Mr. Louangamath's race before pulling him

13  over, *id.* at 127:5–6, 194:14–15, and that their "suspicious vehicle" report was "standard

14  operating procedure" in a situation like this one.  *Id.* at 28:16–20 ("Again, it's kind of our

15  standard operating procedure to put it out as a 9-7-1 if the vehicle is no longer moving when we

16  make contact with it.").[1]

17      Third, the court finds no reason to doubt the officers' credibility in their testimony that

18  they did not actually suspect Mr. Louangamath was in a gang until after they found a firearm and

19  ammunition in the car he was driving.  *Id.* at 116:4–13, 237:10–18.  As noted, Officer

20  Cunningham's phone calls to other officers elsewhere about having located an "Asian gangster,"

21  without further explanation of what he meant, occurred only after the search had located the

22  firearm and ammunition.  *Id.* at 234:4–19; Def. Exs. Bw & Bx (lodged).   Although the officers

23  did not doubt they received at least the one bulletin describing the need to remain alert regarding

24  "Asian Crips" a few days before the stop, the officers testified they often receive these kinds of

25  /////

26  /////

---

[1] A "9-7-1" is radio code for an "occupied suspicious vehicle."  Tr. at 27:10–13.

1    bulletins, and neither officer suggested the bulletins informed their actions in the field during this

2    particular traffic stop.  Tr. at 65:24–66:14, 117:1–14.

3       The court finds the officers had reasonable suspicion to conduct the traffic stop here.

4    **IV.   CONCLUSION**

5       The motion to suppress is **denied.**

6       This order resolves ECF No. 36.

7       IT IS SO ORDERED.

8    DATED:  September 13, 2021.

CHIEF UNITED STATES DISTRICT JUDGE