1

2

3

4

5

6

7

8                           UNITED STATES DISTRICT COURT

9                    FOR THE EASTERN DISTRICT OF CALIFORNIA

10

11    United States of America,                    No. 2:20-cr-00034-KJM

12                        Plaintiff,

13           v.                                      ORDER

14    Derick Louangamath,

15                        Defendant.

16

17           This matter is before the court on Mr. Louangamath's motion for reconsideration of this

18    court's order denying his previous motion to suppress evidence.  At hearing on that motion, the

19    court clarified its previous order in part and stated its intent to deny reconsideration in a written

20    order.  The court explains its reasoning below.

21    **I.      INTRODUCTION**

22           The court described the history of this case in detail in its previous order, ECF No. 93, so

23    only a brief summary is necessary here.

24           On November 23, 2019, Officers Cunningham and Phelan pulled over Mr. Louangamath

25    because they believed he had his high beams on.  *See* Tr. at 21:19–22,[1] 166:21–23, ECF Nos. 77

26    & 83.  Mr. Louangamath admitted his driver's license was not valid in response to Officer

---

[1] To avoid confusion, pages cited here are those printed on the top right page of the document by the CM/ECF system.

1    Phelan's question.  *See* Officer Phelan Body Camera Footage ("Phelan Body Cam") at 3:58–59,

2    Def. Ex. F (lodged).  During this exchange, Officer Phelan saw multiple open beer cans in the

3    car's center console.  *See* Tr. at 33:22–34:1.  After inquiring about Mr. Louangamath's parole

4    status, Officer Phelan asked for and received Mr. Louangamath's consent to search his vehicle.

5    *See* Phelan Body Cam at 1:05–08.  Officer Phelan then directed Mr. Louangamath to exit his

6    vehicle and keep his hands on his head.  Officer Phelan took hold of Mr. Louangamath and led

7    him to the rear of Officer Phelan's police cruiser, where he conducted a pat-down search of

8    Mr. Louangamath's legs and torso.  *See id.* at 1:20–2:26.

9            After Officer Phelan led Mr. Louangamath to the police cruiser, Officer Cunningham

10   found a loaded 10-round pistol magazine in Mr. Louangamath's vehicle.  *See* Tr. at 140:24–25.

11   Officer Cunningham signaled to Officer Phelan that he should handcuff Mr. Louangamath.  *See*

12   *id.* at 141:4–7.  Officer Phelan then handcuffed Mr. Louangamath and ordered him into the back

13   of the police cruiser.  *See* Phelan Body Cam at 2:10.  Before Mr. Louangamath could comply,

14   Officer Phelan pulled Mr. Louangamath's shirt up, looked at his tattoos, and asked several times

15   if he was affiliated with any gang.  *See id.*  Mr. Louangamath repeatedly denied any gang

16   affiliation.  *Id.*  Officer Phelan then put Mr. Louangamath in the police cruiser and closed the

17   door.

18           Meanwhile, while continuing to search the car, Officer Cunningham discovered the

19   firearm and the remaining ammunition underlying the pending charge in this case.  *See* Tr. at

20   34:13–20.  Officer Phelan first questioned Mr. Louangamath's girlfriend, Ms. Kalah, about the

21   evidence, and then told Mr. Louangamath he had to "talk to [him] about some stuff that's going

22   on . . . ."  In-Car Camera Footage ("Dash Cam") at 8:19:45 p.m., Def. Ex. E (lodged).  Soon

23   thereafter, Officer Phelan read Mr. Louangamath his *Miranda* rights.  *See* Phelan Body Cam at

24   21:27.  After Mr. Louangamath admitted the gun belonged to him, and after Officer Phelan asked

25   where he got the gun, Mr. Louangamath said "no further questions.  It's mine, its just . . . ."  *Id.* at

26   24:28–25:02.  Still, Officer Phelan's questioning continued.  *Id.*

27           About seven minutes after Mr. Louangamath invoked his right to remain silent, Officer

28   Cunningham approached and asked for the passcode to his phone.  *See* Dash Cam at 8:30:45 PM;

2

1   Officer Cunningham Body Camera Footage at 33:25, Def. Ex. G (lodged).  Mr. Louangamath

2   said Ms. Kalah knew the passcode, and she revealed it at Officer Cunningham's direction.  *See*

3   Cunningham Body Cam at 33:35.  Officer Cunningham then thoroughly searched the phone.  *See*

4   *id.* at 33:55–45:00.

5          Mr. Louangamath was arrested, and the federal government adopted the case.  It pursues

6   one firearms charge under 18 U.S.C. § 922(g)(1).  *See generally* Indictment, ECF No. 7.

7   Mr. Louangamath moved to suppress the weapon and other evidence in March 2021.  *See*

8   *generally* Am. Mot. Suppress, ECF No. 36.  The court received full briefing, held a two-day

9   evidentiary hearing, and received written closing arguments before denying the motion.  *See* Prev.

10  Order, ECF No. 93.  The court found the officers had credibly testified they believed

11  Mr. Louangamath's high beams had been on and thus had probable cause to suspect a violation of

12  the California Vehicle Code when they pulled him over.  *See id.* at 6–8.

13         Mr. Louangamath now moves for reconsideration.  *See* Mot., ECF No. 98.  The matter is

14  fully briefed.  *See id.*; Opp'n, ECF No. 99; Reply, ECF No. 100.  The court heard argument on

15  November 15, 2021 by videoconference.  *See* Minutes, ECF No. 102.  Aaron Pennekamp

16  appeared for the United States, and Mia Crager appeared for Mr. Louangamath.

17  **II.    LEGAL STANDARD**

18         Although the Federal Rules of Criminal Procedure do not expressly authorize motions for

19  reconsideration, the Ninth Circuit has "approved of the judicial economy that results from the

20  pretrial reconsideration of suppression orders by the district court."  *United States v. Rabb*,

21  752 F.2d 1320, 1322 (9th Cir. 1984), *abrogated in part on other grounds by Bourjaily v. United*

22  *States*, 483 U.S. 171 (1987).  "No precise 'rule' governs the district court's inherent power to

23  grant or deny a motion to reconsider a prior ruling in a criminal proceeding."  *United States v.*

24  *Lopez-Cruz*, 730 F.3d 803, 811 (9th Cir. 2013).  It is instead a matter of discretion.  *Id.*

25         Both "simple mistakes" and "shifting precedent" might justify reconsideration of a

26  nonfinal order.  *See Martin*, 226 F.3d at 1049. This court's local rules also impose requirements

27  on parties who request reconsideration in criminal cases.  *See* E.D. Cal. L.R. 430.1(i).  Among

28  other things, a motion for reconsideration must identify what "new or different facts or

3

1    circumstances" support the motion "or what other grounds" might warrant reconsideration.

2    *Id.* 430.1(i)(3).  But as is true of motions for reconsideration in civil cases, motions for

3    reconsideration in criminal cases are almost always denied when they rest on arguments or

4    evidence the moving party previously raised or could have raised and when denial would not

5    cause manifest injustice.  *See Cachil Dehe Band of Wintun Indians of Colusa Indian Cmty. v.*

6    *California*, 649 F. Supp. 2d 1063, 1069 (E.D. Cal. 2009).

7    **III.   DISCUSSION**

8         In his original motion, Mr. Louangamath alleged seven "independent bases" for

9    suppression of evidence:

10        (1) The officers did not have reasonable suspicion for the initial stop;

11        (2) The officers illegally prolonged the stop by asking about probation or parole status;

12        (3) Officer Phelan violated Mr. Louangamath's right to bodily privacy by invading his

13   clothing;

14        (4) The impoundment was illegal and therefore any inventory search was a violation of

15   the Fourth Amendment;

16        (5) Officer Cunningham illegally procured Mr. Louangamath's passcode in violation of

17   the Fifth Amendment and illegally searched Mr. Louangamath's cell phone without a warrant in

18   violation of the Fourth Amendment;

19        (6) Officer Phelan violated Mr. Louangamath's Fifth Amendment rights by questioning

20   him before giving him *Miranda*[2] warnings; and

21        (7) The officers violated Mr. Louangamath's Fifth Amendment rights by continuing to

22   question him after he invoked his right to remain silent.

23   *See* Mot.. at 2, ECF No. 98.  In seeking reconsideration, Mr. Louangamath acknowledges the

24   court's order on the motion to suppress resolved Issue 1—whether the officers had reasonable

25   suspicion for the initial stop—but argues the court did not address "the other six bases the defense

26   raised in its motion."  *Id.* at 3.  At hearing on November 15, 2021, the court clarified its holding

---

[2] *Miranda v. Arizona*, 384 U.S. 436 (1966).

1    as to Issues 2 and 4 and denied reconsideration.  No further explanation is necessary for these two

2    issues; the transcript will adequately reflect the court's resolution of them.  Of the remaining

3    issues—3, 5, 6, and 7—the government formally opposes the motion to suppress evidence only

4    with respect to Issue 6, and only to the extent Mr. Louangamath seeks to suppress all his

5    statements because of the alleged *Miranda* violation.  The court clarifies its decision on that issue

6    below.  Because the government represents it will not use any of the other contested evidence in

7    its case in chief, the court need not address at this point whether that evidence was obtained in

8    violation of Mr. Louangamath's constitutional rights.  The government does argue, however, that

9    it may use the evidence for impeachment purposes at trial even if that evidence was obtained in

10    violation of Mr. Louangamath's constitutional rights.  The court addresses that position briefly in

11    a separate section below.

12         **A.**      **Suppression (Issue 6)**

13        The parties agree Officer Phelan violated Mr. Louangamath's Fifth Amendment rights by

14    continuing to question him after he said, "No further questions.  It's mine, it's just . . . ."  *See*

15    Mot. Suppress at 28–29, ECF No. 36; Opp'n Mot. at 7, ECF No. 43.  The government is

16    prohibited from using all such evidence in its case in chief.  *Jones v. Harrington*, 829 F.3d 1128,

17    1137 (9th Cir. 2016).  The parties disagree, however, about whether the officers violated *Miranda*

18    before Mr. Louangamath invoked his right to remain silent.  Specifically, Mr. Louangamath

19    argues Officer Phelan violated his Fifth Amendment rights when he began questioning him

20    outside the police cruiser without first giving *Miranda* warnings.

21        It is hornbook law that *Miranda*'s protections apply to statements made by a defendant

22    during custodial interrogation.  *Miranda*, 384 U.S. at 444.  In other words, officers must give

23    warnings when the suspect is (1) interrogated while (2) in custody.  *Id.*

24        **Interrogation**.  Mr. Louangamath's pre-warning statements outside the police cruiser

25    were made in the context of an interrogation.  In determining whether an officer's questions rise

26    to the level of interrogation, the "ultimate test" is "whether, in light of all the circumstances, the

27    police should have known that a question was reasonably likely to elicit an incriminating

28    response."  *United States v. Williams*, 842 F.3d 1143, 1147 (9th Cir. 2016) (quotations omitted).

1   After handcuffing Mr. Louangamath and ordering him into the back seat of the police cruiser,

2   Officer Phelan lifted Mr. Louangamath's shirt and repeatedly asked about his potential gang

3   affiliations.  *See* Phelan Body Cam at 2:10.  Officer Phelan "should have known" such questions

4   were "likely to elicit an incriminating response."  *See generally Williams*, 842 F.3d at 1147–49

5   (noting gang status evidence is incriminating and listing criminal violations that derive from gang

6   membership).  The court thus addresses whether Mr. Louangamath was in custody at the time.

7           **Custody**.  In determining whether an individual is in custody, the court makes two distinct

8   but related inquiries.  First, the court asks "whether a person in [defendant's] position would have

9   felt, under a totality of the circumstances, that [he was] not at liberty to terminate the

10  interrogation and leave."  *United States v. Mora-Alcaraz*, 986 F.3d 1151, 1155 (9th Cir. 2021)

11  (internal quotations omitted).  If so, the court then asks whether a reasonable person in

12  defendant's position would have understood himself to be subjected to the restraints comparable

13  to those associated with a formal arrest.  *California v. Beheler*, 463 U.S. 1121, 1125 (1983) (per

14  curiam); *Stansbury v. California*, 511 U.S. 318, 322 (1994).

15          In this case, a reasonable person in Mr. Louangamath's position would not have felt free

16  to leave; such a person would also reasonably believe he was subject to restraints comparable to

17  those associated with formal arrest.  Two primary factors underpin this finding.

18          First, Mr. Louangamath was handcuffed, and handcuffs are a "trapping[] of a technical

19  formal arrest."  *Dunaway v. New York*, 442 U.S. 200, 215 n.17 (1979); *see also United States v.*

20  *Newton*, 369 F.3d 659, 676 (2d Cir. 2004) ("Handcuffs are generally recognized as a hallmark of

21  a formal arrest." (citing *New York v. Quarles*, 467 U.S. 649, 655 (1984))); *United States v.*

22  *Glenna*, 878 F.2d 967, 972 (7th Cir. 1989) ("[H]andcuffs are restraints on freedom of movement

23  normally associated with arrest." (emphasis omitted)).[3]

---

[3] At one point, Officer Phelan himself seemed to acknowledge that being handcuffed in the back seat of a police cruiser amounts to being in custody.  After the officers found the gun in Mr. Louangamath's car, and before questioning him about it, Officer Phelan said: "Since you're handcuffed, you're in the back of a police car, I can't really talk to you about what's going on without reading you your rights. You understand?"  Phelan Body Cam at 21:27.

6

1    Second, Mr. Louangamath had been ordered into a police cruiser after the police saw open

2  beer cans, learned he was driving with a suspended driver's license, and found ammunition in the

3  car.  Because reasonable people would understand themselves to be subject to police authority

4  after the police find incriminating evidence and order them into the back of a police car, these

5  circumstances also resemble custody.  *Cf. Burlew v. Hedgpeth*, 448 F. App'x 663, 664–65 (9th

6  Cir. 2011) (unpublished) (noting that in Ninth Circuit and some others, a person is "in custody"

7  when detained in back of police car (citing *United States v. Henley*, 984 F.2d 1040, 1042 (9th Cir.

8  1993))); *Cromwell v. Prosper*, No. 06-2412, 2011 WL 1497080, at *8 (E.D. Cal. Apr. 19, 2011)

9  (unhandcuffed "parolee in the back seat of a police car being questioned by a police officer who

10  has just discovered him to be in possession of a gun experiences the functional equivalent of

11  being taken into custody").

12    The fact that Mr. Louangamath was not yet in the police cruiser does not require a

13  different result.  Defendants may be in custody if they are physically restrained by a closed car

14  door, *see Henley*, 984 F.2d at 1042 (having "no trouble" concluding defendant was in custody

15  when he was handcuffed in the back seat of a squad car, even though defendant was told he was

16  not under arrest), or if they are not yet physically restrained because the car door is open, *see*

17  *Cromwell*, 2011 WL 1497080, at *8 n.5 (agreeing with Seventh Circuit concurrence noting "the

18  custodial nature of the questioning did not change just because the car door was open").

19    Here, Mr. Louangamath had been ordered into the car.  Although he was not yet

20  physically restrained, Mr. Louangamath had every reason to believe he soon would be.  He was

21  not free to leave, and he was subject to restraints comparable to those associated with formal

22  arrest.  Because Mr. Louangamath was subjected to custodial interrogation before he was made

23  aware of his rights under *Miranda*, any statements during this initial interrogation before

24  Mr. Louangamath was actually inside the police cruiser are suppressed.  *Miranda*, 384 U.S. at

25  444.

26    **Post-Miranda Statements.** Mr. Louangamath asks this court to suppress all of his

27  statements, even those he made after he received the *Miranda* warning, arguing the belated

28  *Miranda* warnings did not "remove the taint" of the officer's initial violation.  *See* Reply to Opp'n

1   at 2, ECF No. 100.  In support of this proposition, Mr. Louangamath cites *Missouri v. Siebert*,

2   542 U.S. 600, 617 (2004).  *Siebert* is inapplicable.  *Siebert* involved "a police protocol for giving

3   no warnings of the rights to silence and counsel until interrogation has produced a confession."

4   *Id.* at 600.  "The object" of that "question-first" practice was "to render *Miranda* warnings

5   ineffective by waiting for a particularly opportune time to give them, after the suspect has already

6   confessed."  *Id.* at 611.  Not only is there no evidence of such a protocol here., Mr. Louangamath

7   did not confess or discuss the gun and ammunition prior to the *Miranda* warnings.

8   Mr. Louangamath's statements made after Officer Phelan read the *Miranda* warning and before

9   Mr. Louangamath invoked his right to silence are not suppressed.

10           **B.       Impeachment (Issues 3, 5, 6 and 7)**

11           The parties dispute whether the government may rely on evidence obtained in violation of

12   Mr. Louangamath's constitutional rights to impeach him at trial.  As a general matter, statements

13   and evidence obtained in contravention of the Fourth and Fifth Amendments may not be admitted

14   at trial.  *Weeks v. United States*, 232 U.S. 383, 398 (1914).  However, an exception to this

15   exclusionary rule allows some illegally obtained evidence to be used for the limited purpose of

16   impeaching the credibility of a defendant's direct testimony.  *Walder v. United States*, 347 U.S.

17   62, 74 (1954).  In other words, courts do not let defendants "affirmatively resort to perjurious

18   testimony in reliance on the Government's disability to challenge [their] credibility."  *Id.* at 65.

19   In determining whether illegally obtained evidence may be used for impeachment, the primary

20   inquiry is whether it is "reliable and probative evidence [that] would significantly further the

21   truth-seeking function of a criminal trial . . . ."  *James v. Illinois*, 493 U.S. 307, 311 (1990).[4]  The

22   Supreme Court is generally permissive in admitting evidence for impeachment, but involuntary

23   statements are disallowed.  *See Mincey v. Arizona*, 437 U.S. 385, 398 (1978) ("[A]ny criminal

---

[4] The Court also has asked whether there is more than "'a speculative possibility'" that admitting such evidence "would encourage police misconduct."  *Id.* at 311–12 (quoting *Harris v. New York*, 401 U.S. 222, 225 (1971)).  But more recently it has deemphasized this part of the inquiry.  *See Oregon v. Hass*, 420 U.S. 714, 723 (1975) (finding voluntariness and trustworthiness—not encouragement of police misconduct—limit admission of illegal evidence, even though an officer conducting the illegal questioning may "have little to lose and perhaps something to gain by way of possibly uncovering impeachment material.").

1    trial use against a defendant of his *involuntary* statement is a denial of due process of law . . . ."

2    (emphasis in original)).

3        Here, based on the record before the court, nothing suggests the disputed evidence may

4    not be used for impeachment.  No evidence suggests Officers Phelan and Cunningham were

5    coercive.  No circumstances call into question the veracity of Mr. Louangamath's statements, to

6    the extent he said anything, or the reliability of evidence regarding his tattoos or the material

7    found on his phone.

8        The court notes, however, the strict requirements that will apply to any use of this

9    evidence at trial.  It may be used only to impeach Mr. Louangamath's credibility, not the

10   credibility of any other witness.  *James*, 493 U.S. at 313.  And it may be introduced only if

11   Mr. Louangamath's direct testimony opens the door, that is, if Mr. Louangamath makes a

12   statement on direct examination that directly contradicts the illegally obtained evidence.  *United*

13   *States v. Whitson*, 587 F.2d 948 (9th Cir. 1978).

14   **IV.    CONCLUSION**

15       Mr. Louangamath's motion for reconsideration is **denied** in part and **granted** in part as

16   reviewed and clarified above.

17       This order resolves ECF No. 98.

18       IT IS SO ORDERED.

19    DATED:  December 14, 2021.

20                                                        _____
                                                         CHIEF UNITED STATES DISTRICT JUDGE

9